**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

E.F., a minor, by and through her parent and
natural guardian, Marie Farrell; A.S., a minor,
by and through his parent and natural guardian,
Mariya Pustovalova; L.P., a minor, by and
through his parent and natural guardian,
Jennifer Petri, on behalf of themselves and a
class of those similarly situated, and Disability
Rights New York,

                Plaintiffs,

-against-

THE NEW YORK CITY DEPARTMENT OF
EDUCATION; THE CITY OF NEW YORK;
RICHARD CARRANZA, in his official
capacity as Chancellor of the New York City
Department of Education,

                Defendants.

No. 1.21-CV-00419

**CLASS ACTION COMPLAINT**

## INTRODUCTION

1.      This civil rights class action lawsuit is brought against the New York City

Department of Education (the "DOE"), the City of New York (the "City"), and Richard A.

Carranza in his official capacity as the Chancellor of the New York City Department of

Education (the "Chancellor") (collectively "Defendants") on behalf of a class of almost 2,000

Staten Island students with disabilities who are being educated in segregated and unequal public

schools and classrooms in violation of the Americans with Disabilities Act ("ADA"), Section

504 of the Rehabilitation Act ("Section 504"), the Individuals with Disabilities Education Act

("IDEA"), and the New York City Human Rights Law ("NYCHRL").

2. The DOE funds and operates a wholly separate citywide school district based solely on disability known as District 75, which on Staten Island draws students from Staten Island public schools ("Staten Island District 75").

3. The DOE created District 75 to serve as a separate school district for students with "moderate to severe disabilities," including autism spectrum disorders, cognitive delays, sensory impairments, emotional disturbances, and multiple disabilities.

4. Over 25,000 students with disabilities attend District 75 schools citywide, and almost 2,000 students with disabilities attend Staten Island District 75 schools.

5. District 75 students are placed in a separate District 75 school (containing only District 75 students) or a co-located District 75 placement that is composed of classrooms located within a neighborhood DOE school.

6. Regardless of the District 75 setting in which students are placed, District 75 students spend all or almost all of their school day segregated from students without disabilities.

7. Students with disabilities placed in Staten Island District 75 schools could be educated successfully alongside students without disabilities in traditional, neighborhood public schools—also called "community schools"—in Staten Island, if provided with appropriate and legally required services and supports.

8. The Staten Island District 75 school system denies students with disabilities equal educational opportunities by forcing them into a segregated environment, providing them with an education that is not comparable to that which students without disabilities receive, and denying them access to electives, extracurricular activities, or other opportunities to interact with students without disabilities, such as lunch or recess.

9.     In 2008, at the DOE's request, the Council of the Great City Schools ("CGCS"), one of the leading national organizations supporting urban education, put the DOE on notice that by funding and operating District 75 it is improperly and inefficiently consuming and diverting resources that should be spent on providing students with disabilities with an integrated learning environment in community schools.

10.     The CGCS report concluded that "the isolation of students [is] more pronounced in the New York City school system than in other major urban school systems . . ."

11.     By continuing to isolate unnecessarily students with disabilities in Staten Island District 75 schools, Defendants perpetuate stigma, misunderstanding, and fear and reinforce feelings of shame and unworthiness for students with disabilities who have been labeled as unfit to learn and unwelcome in their Staten Island community schools.

12.     The COVID-19 pandemic has challenged Defendants to demonstrate unprecedented flexibility in restructuring the way education is delivered; as such, there has never been a more opportune time to apply that same resourcefulness and commitment to reform the delivery of educational services to Staten Island students with disabilities in a manner firmly rooted in integration and equal opportunities to education in community schools.

13.     Without intervention, Defendants' responses to the COVID-19 pandemic will further entrench segregation and deny students with disabilities access to the same quality of education in the most integrated setting enjoyed by their peers without disabilities.

14.     By unnecessarily segregating students with disabilities from their peers without disabilities, Defendants violate the ADA, Section 504, the IDEA, and the NYCHRL, which all require public school districts to provide programs, services, and activities to students with disabilities in the most integrated setting appropriate to their needs.

15.     The individual Named Plaintiffs E.F., A.S., L.P., and Plaintiff Disability Rights New York ("DRNY") (collectively "Named Plaintiffs") seek an order requiring Defendants to provide all necessary services and supports in community schools such that Named Plaintiffs and the Plaintiff Class are given a meaningful opportunity to attend these schools, thereby ending the systematic placement of Staten Island District 75 students into segregated and unequal schools and classrooms.

## JURISDICTION

16.     Named Plaintiffs and putative Plaintiff Class Members bring claims under Title II of the ADA, 42 U.S.C. § 12101 *et seq.*; Section 504, 29 U.S.C. § 794; the IDEA, 20 U.S.C. § 1400 *et seq.*; and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*

17.     This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4), as this is a civil rights action arising under the laws of the United States.

18.     This Court has jurisdiction over the supplemental claims arising under New York City law pursuant to 28 U.S.C. § 1367(a).

## VENUE

19.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District because Defendants are located within this District and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

20.     Named Plaintiff E.F. is eighteen years old and a resident of Staten Island, is a student with a disability, has an Individualized Education Program ("IEP"), attends P. 37R, a separate Staten Island District 75 school site, and has as her next friend her mother, Marie Farrell.

21.     Named Plaintiff A.S. is a nine-year-old child and a resident of Staten Island, is a student with a disability, has an IEP, has until recently attended P.S. 373, a separate Staten Island District 75 school site, and has as his next friend his mother, Mariya Pustovalova.

22.     A.S. remains at significant risk for re-enrollment in a Staten Island District 75 school.

23.      Named Plaintiff L.P. is a fourteen-year-old child and a resident of Staten Island, is a student with a disability, has an IEP, attends Tottenville High School, a Staten Island community school, but remains at risk of being transferred to a Staten Island District 75 school because in the recent past the DOE has denied L.P. supports and services in a community school and suggested that he would be better served in a segregated setting, and has as his next friend his mother, Jennifer Petri.

24.     Named Plaintiff DRNY is the federally and state-authorized Protection and Advocacy System and Client Assistance Program ("P&A/CAP") for people with disabilities in New York State, which has been designated by Congressional statute to pursue legal, administrative, and other appropriate remedies to ensure the protection of people with disabilities. *See* 42 U.S.C. § 15043(a)(1), (a)(2)(A)(i); 42 U.S.C. §§ 10805(a)(1)(B), 10801(b)(2)(A).

25.     Named Plaintiff DRNY's mission includes ensuring that students with disabilities receive an appropriate education in the least restrictive environment and most integrated setting appropriate.

26.     Defendant DOE, formally known as the Board of Education of the City School District of the City of New York, *see* N.Y. Educ. Law § 2590-b(1)(a), is a local education agency that operates the City's public school program.

27.     The DOE is a department of the government of the City, *see* N.Y. Educ. Law §
2590-g; 20 U.S.C. §§ 1401(19)(A), 1413(a)(1), and receives federal financial assistance to
operate its school system and services subject to Section 504, 29 U.S.C. § 794.

28.     The DOE is a public entity covered by Title II of the ADA, 42 U.S.C. § 12131 *et
seq*. 38.

29.     Defendant the City of New York is a municipal entity created and authorized
under the laws of the State of New York and receives federal financial assistance related to the
provision of educational services subject to Section 504, 29 U.S.C. § 794.

30.     The City is a public entity covered by Title II of the ADA, 42 U.S.C. § 12131 et
seq.

31.     Defendant Chancellor Richard Carranza is entrusted with powers and duties set
forth in N.Y. Educ. Law § 2590-h, including overseeing the DOE and District 75. *See* N.Y.
Educ. Law § 2590-h.; 20 U.S.C. §§ 1401(19)(A), 1413(a)(1).

32.     The Chancellor, who is sued in his official capacity, is responsible for supervising
all special education programs and services in DOE schools and for preventing and addressing
unlawful discrimination, including disability discrimination. *See id*. at § 2590-h(1)(c), (d).

## CLASS ALLEGATIONS

33.     Named Plaintiffs bring this action individually and on behalf of all persons ("the
Plaintiff Class") similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

34.     The Plaintiff Class consists of students with disabilities who receive education in
a Staten Island District 75 school or classroom or are at significant risk of being placed in a
Staten Island District 75 school or classroom.

35.     The Plaintiff Class is so numerous that joinder of all members is impracticable.

36.     The DOE's enrollment data, as reported to the New York State Education Department, indicates that almost 2,000 students with disabilities attend a Staten Island District 75 school or classroom.

37.     There are questions of law and fact common to the Plaintiff Class because all class members are subject to and are affected in the same manner by the unnecessary segregation in the same systemwide network of unequal and separate Staten Island District 75 schools, or are at significant risk of segregation in Staten Island District 75, in violation of the ADA, Section 504, the IDEA, and the NYCHRL.

38.     The individual Named Plaintiffs' claims typify the claims of the Plaintiff Class because, due to Defendants' policies, practices, procedures, acts, and omissions, all named Plaintiffs have been or are at significant risk of being denied their legal rights to receive an appropriate education in the most integrated setting appropriate for them, which is in the DOE community schools alongside their non-disabled peers.

39.     The Named Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class because each Named Plaintiff possesses a strong interest in the subject matter of this lawsuit.

40.     There are no conflicts between the Named Plaintiffs and other Plaintiff Class Members.

41.     Plaintiffs' counsel is experienced in federal class action litigation, including in education, special education, and the civil rights of persons with disabilities.

42.     Defendants' policies, practices, procedures, acts, and omissions have the effect of harming all class members in the same manner.

43. Defendants have violated the rights of the Named Plaintiffs and the Plaintiff Class by failing to educate them in the most integrated setting appropriate or have increased their risk of being subjected to such harms in the future.

44. Final declaratory and injunctive relief is appropriate for the Named Plaintiffs and the Plaintiff Class.

## LEGAL FRAMEWORK

45. Defendants are obligated under federal and local disability rights laws to provide students with disabilities the opportunity to be educated alongside their non-disabled peers, with appropriate services and support.

46. The ADA and Section 504 require public school districts to educate students with disabilities in the most integrated setting appropriate to their needs. *See* 42 U.S.C. §§ 12132, 12134; 29 U.S.C. § 794; 28 C.F.R. § 35.130(d); 34 C.F.R. § 104.4(b)(2).

47. School districts must make such reasonable accommodations to their policies, practices, and procedures as are needed so that students with disabilities can be educated in the most integrated setting appropriate. *See* 28 C.F.R. § 35.130(b)(7).

48. Failure to make such accommodations denies students with disabilities equal educational opportunities, including access to effective academic instruction and social-emotional learning with non-disabled peers, and the opportunity to participate in and benefit from the same electives and extracurricular and school-related activities as students without disabilities. *See* 28 C.F.R. § 35.130(b)(1)(ii); 34 C.F.R. §§ 104.4(b)(1)(ii), 104.34, 104.37(a).

49. The IDEA obligates Defendants to provide a free appropriate education ("FAPE") to students with disabilities in the least restrictive environment in which they can learn alongside

their nondisabled peers, to the maximum extent appropriate to their needs. *See* 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(2)(i).

50.     Under the IDEA, students with disabilities may not be removed unnecessarily from general education classrooms in community schools if they could be served effectively with appropriate services and supports, which are set forth in each student's IEP. 34 C.F.R. § 300.114(a)(2)(ii).

51.     The NYCHRL prohibits disability discrimination in places of public accommodation, which includes educational institutions. N.Y.C. Admin. Code. §§ 8-102(9), 8-107(4).

52.     Under the NYCHRL, Defendants must make reasonable accommodations for individuals with disabilities when necessary for them to enjoy their equal rights. N.Y.C. Admin. Code § 8-107(15).

53.     The Named Plaintiffs cannot exhaust administrative remedies through the administrative procedures available to them under the IDEA because it is futile to do so, as the harms that the Named Plaintiffs allege and the remedies that they seek are systemic.

54.     Systemic deficiencies are not capable of resolution through administrative review of an individual student's "due process" claim, nor is systemic relief available as a remedy in such a case.

55.     Further, because the gravamen of the Named Plaintiffs' claims under the ADA and Section 504 lies in their unnecessary isolation and stigmatization, they need not exhaust these claims, as it would be futile to do so.

## FACTUAL BACKGROUND

56. Defendant DOE operates the public school system in all five boroughs of the City of New York, providing educational programs and services to well over one million students in 1,866 schools, including public charter schools.

57. Approximately 227,000 of these students receive special education under the IDEA.

58. The DOE public school system is divided into thirty-two community school districts, which provide educational services largely based on geographic criteria.

59. In addition to community school districts, the DOE created and operates District 75 to serve as a separate, citywide school district for special education students with "significant challenges," including autism spectrum disorders, significant cognitive delays, sensory impairments, emotional disturbances, and multiple disabilities.

60. District 75, in Staten Island and elsewhere in New York City, has a budget and administrative structure that is kept separate from that for the rest of the DOE's schools.

61. The DOE has chosen to create a separate funding stream for District 75, even though District 75's funding comes from the DOE's $34 billion budget.

62. The majority of District 75 students are either Black or Latinx.

63. Black students are enrolled in District 75 at a rate disproportionate to their presence in the general New York City public school student population: In the 2016-2017 school year, Black students made up 26.5 percent of New York City public school students, and 28.2 percent of students receiving special education, but 36.7 percent of the District 75 student population.

64. The DOE does not publish specific criteria for placement in District 75 or state whether such criteria exist.

65.     Approximately 2,000 Staten Island students with disabilities are currently placed in District 75 schools and classrooms.

66.     There is one community school district on Staten Island, District 31, which is comprised of about seventy-five different schools serving approximately 62,000 students in grades pre-kindergarten through twelve.

67.     There are four Staten Island District 75 schools:  I.S./P.S. 25 (South Richmond High School), P. 721 (Richard H. Hungerford School), P. 37R (David Marquis School of the Arts), and P.S. 373.

68.     Some of the sites in the four Staten Island District 75 schools are separate buildings on self-contained campuses, and some are "co-located" on the same campus as District 31 community schools on Staten Island.

69.     Staten Island District 75 schools enroll Black students at a rate disproportionate to District 31 community schools: in the 2016-2017 school year, the median Black student enrollment in the four Staten Island District 75 schools was 22.5 percent, while the median Black student enrollment in District 31 was 12.8 percent

70.     In many circumstances, a student's disability classification or need for a specific mode of instruction or supportive service results in an automatic referral to a segregated Staten Island District 75 placement without the legally required consideration of ways to accommodate and serve the student in a District 31 community school.

71.     In Staten Island, nearly all students with disabilities who are "alternately assessed" are automatically denied the opportunity to attend a community school and are instead dispatched to a segregated Staten Island District 75 placement.

72.     An alternately assessed student is taught and assessed based on alternate academic achievement standards rather than the New York State Learning Standards ("Standards"), applicable to all other students attending public schools in New York State.

<h1 style="text-align:center">FACTUAL ALLEGATIONS</h1>

**District 75 Students are Segregated from Their Peers in Unequal Facilities.**

73.     Staten Island District 75 students are isolated by their placement in Staten Island District 75, remaining separated from students without disabilities in community schools and having few, if any, opportunities to return to a community school.

74.     Regardless of whether they attend a separate school or a co-located separate classroom, students with disabilities who attend Staten Island District 75 schools spend all or almost all of their school day segregated from students without disabilities.

75.     At the stand-alone Staten Island campuses, Staten Island District 75 students with disabilities spend each school day totally segregated, as there are no students without disabilities in these locations.

76.     Many of these Staten Island District 75 segregated campuses lack essential educational facilities such as libraries, cafeterias, gymnasiums, or playgrounds.

77.     At co-located Staten Island sites, Staten Island District 75 classrooms are operated and administered by District 75.

78.     Upon information and belief, the vast majority of students in co-located classrooms are excluded from most school-wide functions and typically spend the entire school day isolated from their peers without disabilities.

79.     There are no students without disabilities in the Staten Island District 75 classrooms in co-located schools in Staten Island.

80.     Many co-located Staten Island District 75 classrooms are located in trailers and in separate areas of the school building, and these buildings and areas often have separate entrances that are not used by students without disabilities.

81.     As the 2008 CGCS report notes, Staten Island District 75 staff have hesitated to reject inappropriate referrals, even if they believe that the referred student should be educated in a District 31 school, because they are unsure whether the community school can provide necessary supports and services.

82.     Even when a Staten Island District 75 student can be supported in a community school, the student is often unable to transition back because the District 31 school does not provide necessary supports and service.

83.     Once the DOE places a student in a Staten Island District 75 school, the student returning to a community school is difficult because the DOE's funding of a segregated system precludes the provision of an appropriate continuum of services in community schools.

**Staten Island District 75 Students Receive Unequal Educational Opportunities.**

84.     Most Staten Island District 75 students are denied the opportunity to be educated in the community schools, magnet or specialized schools, public charter schools, and other schools available to their non-disabled peers.

85.     Staten Island District 75 students are denied the many positive benefits of being educated in classrooms with their peers without disabilities, including access to a curriculum that meets the requirements of a regular high school diploma, higher educational expectations set by both teachers and peers, and learning appropriate social skills and behaviors modeled by classmates without disabilities.

86.     While District 31 students typically attend the community school closest to their home, Staten Island District 75 students are often placed without regard to the neighborhood in which they reside, sometimes resulting in daily commutes of two hours or more.

87.     As the 2008 CGCS report notes, unlike District 31 community schools, which use a curriculum consistent with the Standards designed to build knowledge from grade to grade, Staten Island District 75 classrooms' curriculum is substandard, inconsistently implemented, and does not emphasize learning outcomes that will result in a high school diploma.

88.     As a result of the less formalized and rigorous academic instruction, Staten Island District 75 students may remain at the same academic level for years, or even regress.

89.     The DOE does not systemically provide Staten Island District 75 students with the same educational tools, resources, technology, and other means of engaging students in learning as their non-disabled peers in District 31.

90.      Many Staten Island District 75 students spend hours on busy work that masquerades as academic work or preparation for employment but produces no meaningful skill development.

91.     Defendants deny Staten Island District 75 students other critical benefits of integrated educational settings, including learning and practicing appropriate social skills with peers without disabilities and learning behaviors modeled by classmates without disabilities.

92.     Many students who attend Staten Island District 75 schools have no or minimal access to after-school or extracurricular activities, such as clubs, sports teams, or other non-academic enrichment opportunities, as compared to their peers in DOE community schools, thereby denying them the opportunity to develop ties to a local neighborhood and community.

93.     Many students in District 75 classrooms co-located in community schools are prevented from taking electives or participating in extracurricular activities at the community school in which the District 75 classroom is located due to transportation barriers or discriminatory exclusion.

94.     The minimal amount of academic achievement data that Defendants make publicly available about Staten Island District 75 indicates that many students fail to achieve basic learning standards.

95.     Upon information and belief, Staten Island District 75 students rarely have a chance to earn the standard diploma that other students in New York City public schools are awarded.

96.     The graduation rates for students with disabilities educated by the DOE shows this inequality in education.

97.     In 2019, the latest year for which data is publicly available, only 53% of students with disabilities in New York City graduated in four years compared to 83% of high school students without disabilities.

98.     Upon information and belief, this graduation gap of 30% between students with and without disabilities is much larger for Staten Island District 75 students, almost all of whom never graduate with a standard diploma.

99.     The IEP process is designed to help a student advance from grade to grade, but many Staten Island District 75 IEP plans repeat the same academic goals for students with disabilities year after year.

100.     Upon information and belief, Staten Island District 75 staff oversee and conduct all IEP planning for Staten Island District 75 students without including staff from the

community schools that students would attend but for their disability, in violation of New York State law 20 U.S.C. 1414(d)(1)(B).

### Staten Island District 75 Students Could Be Educated in District 31 Schools If Appropriate Supports and Services Were Available.

101.    By operating and funding Staten Island District 75 schools separate and apart from Staten Island District 31 schools, the DOE maintains a two-tiered, segregated system that relieves it of responsibility for serving Staten Island District 75's students with disabilities appropriately in integrated settings in the District 31 schools, which impedes the successful transition of these students back to community schools.

102.    The Named Plaintiffs and the Plaintiff Class members could be educated in Staten Island District 31 community schools if Defendants ensured that the legally mandated supports and services that address these students' disability-related needs were available in the community schools.

103.    The overall capacity to provide supports and services to address disability-related needs in Staten Island community schools is currently inadequate to meet the demand.

104.    The DOE places children with disabilities in Staten Island District 75 schools, typically before providing effective academic interventions to engage these students in learning and permit them to demonstrate mastery of Standards-based curricula.

105.    The DOE often also places children in Staten Island District 75 schools without providing them individualized behavioral supports of adequate intensity and consistency, conducting legally compliant or effective Functional Behavior Assessments ("FBAs") of the causes and consequences of specific target behaviors, and developing and implementing effective Behavioral Intervention Plans ("BIPs") based on those FBAs.

106.     Without such individualized behavioral supports, community schools often address disability-related behaviors with formal suspensions or expulsions and force parents to stabilize their child themselves, by telephone or in person, often in the middle of a parent's workday, or by keeping the child home from school.

107.     If more intensive behavior support is needed for a District 31 student with a disability, then often that student is recommended for a segregated Staten Island District 75 placement.

108.     Parents of a disabled child attending a Staten Island community school must choose between a segregated, subpar Staten Island District 75 placement or the disruption caused by their child's disciplinary removals from the community school classroom.

109.     Research shows that integrating students with disabilities in community schools alongside peers without disabilities produces better academic and adult life outcomes for the students with disabilities.  *See, e.g.*, Jose Blackorby et al., SRI Int'l, *What Makes a Difference? Influences on Outcomes for Students with Disabilities* 7-7 (Feb. 2007), *available at* http://www.seels.net/designdocs/ SEELS_W1W3_FINAL.pdf; Mary Wagner & Jose Blackorby, SRI Int'l, *Overview of Findings from Wave 1 of the Special Education Elementary Longitudinal Study (SEELS)* 24 (June 2004), *available at* http://www.seels.net/designdocs/seels_wave1_9-23-04.pdf; Mary Wagner et al., SRI Int'l, *What Makes a Difference? Influences on Postschool Outcomes of Youth with Disabilities: The Third Comprehensive Report from the National Longitudinal Transition Study of Special Education Students* 4-8 to 4-9 & tbl. 4-5 (Dec. 1993), *available at* http://files.eric.ed.gov/fulltext/ED365085.pdf.

110.     Research shows that the integration of students with disabilities also benefits students without disabilities, who do better academically in classrooms where students with

disabilities are educated because the non-disabled students develop sensitivity and understanding toward others with diverse life experience and have the opportunity to serve as role models for peers. *See, e.g.*, Gary L. Peltier, *The Effect of Inclusion on Non-Disabled Children: A Review of the Research*, 68 Contemp. Educ. 234-37 (1997); Wayne S. Sailor & Amy B. McCart, *Stars in Alignment*, 39 Res. & Prac. for Persons with Severe Disabilities 55, 57-58 (2014).

111.    Research indicates that experienced teachers, including those with special education experience, can mitigate any adverse effects of placing children with disabilities in classrooms with non-disabled children. *See* Michael A. Gottfried et al., *Does the Presence of a Classmate with Emotional/Behavioral Disabilities Link to Other Students' Absences in Kindergarten?*, 36 Early Childhood Res. Q. 506, 514-16 (2016).

112.    Staten Island District 31 community schools can and do serve students with disabilities who need varying levels of support.

113.    District 31 schools could meet the needs of District 75 students with disabilities by providing appropriate services and supports.

114.    Public schools, including those outside New York City, provide appropriate services and supports to meet the needs of children with disabilities like those in District 75 in integrated settings like the District 31 schools.

115.    It would not fundamentally alter the nature of the education services that the DOE currently provides to enroll students who are currently segregated in Staten Island District 75 in District 31 schools.

### Staten Island District 75 Students and Parents Do Not Oppose Enrollment in District 31 Schools with Appropriate Supports and Services.

116.    Many parents of Staten Island District 75 students with disabilities would prefer that their children attend a District 31 community school, with appropriate supports and services.

117.    Families of students with disabilities are often told that a segregated Staten Island District 75 school is the only setting in which their child can receive needed services.

118.    Families are also told that only Staten Island District 75 staff have the expertise required to effectively teach children with disabilities.

119.    Many parents agree to their child's placement in Staten Island District 75, but after doing so are disappointed because their child fails to receive services and supports that effectively address their learning and behavioral needs.

120.    Although parents may ultimately agree to their child's placement in Staten Island District 75, in many cases the DOE does not explain the long-term ramifications of this placement; as a result, many parents do not understand that District 75 students are often placed on the alternate assessment track, with little chance of earning a standard diploma, which may significantly limit their child's post-secondary options.

121.    The DOE frequently rejects requests of Staten Island District 75 parents to transfer their child back to a community school.

122.    Parents of Staten Island District 75 students who attempt to have their child returned to a community school often face a lengthy, bureaucratic, and difficult process.

**The DOE Has Known About the Problems of District 75 for Years.**

123.    In 2007, the DOE requested that an expert team from the CGCS review District 75's programs and services for students with disabilities.

124.    In June 2008, CGCS issued its report, *Improving Special Education in New York City's District 75* (June 2008), *available at* https://www.uft.org/files/attachments/nyc-cgcs-report.pdf.

125.    In criticizing the systemic isolation of District 75 students, CGCS stated that students "are often cut off from their non-disabled peers and segregated from programs and services that could be beneficial."

126.    CGCS commented that "[l]eaving District 75 alone is not acceptable" because "the isolation of expertise in many District 75 programs has left the larger system of schools without many of the supports and some of the expertise to provide these students with what they need."

127.    CGCS's report provided a roadmap for how the community schools could build capacity to serve District 75 students, including "[b]uild[ing greater capacity and options for a Least Restrictive Environment (LRE) for students with disabilities"; "[e]hanc[ing] and expand[ing] transitional services from District 75 schools and programs to community schools"; "[d]evelop[ing] clear procedures and standards of practice for community schools on how they intervene with and monitor the academic and behavior needs of significantly challenged students"; "[e]nhanc[ing] professional development for community-school teachers and staff to work with students with disabilities to build capacity for providing services without having to send students to District 75"; and "[p]rovid[ing] supports for students at home schools."

128.    Instead of developing this expertise and investing resources to serve Staten Island District 75 students with disabilities in District 31 community schools, the DOE continued to maintain a segregated system of education for the students.

129.    Upon information and belief, the DOE continues to tell parents that if their child needs additional support, they must go to Staten Island District 75, without considering supports and services that could be provided in a more integrated setting.

130. Parents, students, and advocates have regularly sought greater integration for District 75 students and have asked for the DOE to "[c]reate[] a citywide plan that focuses on integrating students with disabilities attending District 75 schools with non-disabled students in other programs in their school buildings." IncludeNYC, *Oversight Hearings on Segregation in New York City Schools* (May 1, 2019), *available at* https://www.includenyc.org/news/post/nyc-council-joint-committee-oversight-hearing-on-segregation-in-new-york-ci.

131. The DOE does not employ a comprehensive or effective plan to enable Staten Island District 75 students who are qualified for and who want to be educated in community schools to participate in integrated programs in community schools.

132. The Named Plaintiffs have repeatedly asked Defendants to collaborate in a timely, results-driven process to address their concerns about District 75's segregated and unequal system, but Defendants have not responded to this invitation.

### *Named Plaintiffs' Individual Allegations*

133. As school-age residents of New York City, the individual Named Plaintiffs are eligible to receive educational services through the DOE and, by virtue of their disabilities, are protected by the ADA, Section 504, the IDEA, and the NYCHRL.

### *E.F.*

134. E.F. is eighteen years old, autistic, and has had an IEP since she was four years old.

135. E.F. attends Staten Island District 75 school P. 37R, but her community District 31 school is Tottenville High School, which offers its students over thirty electives and extracurricular opportunities—including dozens of sports teams—unavailable to E.F. and other Staten Island District 75 students.

136.     E.F. is a talented artist who enjoys creating artwork about animals, and she cares for her animals at home.

137.     E.F. also loves biology and learning about how the human body works.

138.     E.F. is compassionate toward other people and wants to help when others are sick or hurting.

139.     E.F. also enjoys sports, such as cheerleading and bowling.

140.     From pre-kindergarten through first grade, E.F. attended a private, segregated school for autistic children.

141.     In October of E.F.'s second-grade year, Ms. Farrell., E.F.'s parent, transferred her to P.S. 60, a District 31 school, because E.F. was no longer making progress in the segregated school.

142.     E.F. struggled academically and socially at P.S. 60.

143.     From the outset, teachers and staff told Ms. Farrell that E.F. needed to be removed from the community school.

144.     Ms. Farrell received calls from the school almost every day about E.F.'s behaviors and frequently had to come to school to pick up E.F.

145.     Because P.S. 60 did not help E.F. engage with other students, her classmates shunned and isolated her.

146.     E.F.'s teacher treated her harshly, sent home notes about her behavior, and punished her for small outbursts.

147.     E.F. also did not receive appropriate academic supports and services at P.S. 60, including the speech therapy listed on her IEP.

148.     The community school did not provide the behavioral supports that E.F. needed.

149.     Despite Ms. Farrell requesting a FBA for E.F., P.S. 60 did not conduct one until just before staff told Ms. Farrell that they were recommending that E.F. be placed in a more restrictive setting.

150.     In March of E.F.'s second grade year, Ms. Farrell attended what she thought would be a brainstorming meeting about ways to help E.F. thrive at P.S. 60.

151.     Instead, at that meeting a school official surprised Ms. Farrell by telling her that E.F. needed to leave P.S. 60 and attend a Staten Island District 75 school.

152.     DOE staff led Ms. Farrell to believe that a Staten Island District 75 school was the only option for E.F. and had more supports in place for students like E.F., so Ms. Farrell enrolled E.F. in P.S. 37R.

153.     E.F. currently attends the segregated Staten Island District 75 school P. 37R at its co-located site on the campus of Great Kills High School.

154.     Great Kills High School currently provides no extracurricular opportunities for Staten Island District 75 students.

155.     E.F. briefly participated in a cheerleading program at Great Kills High School, but that program was ended after several months, which devastated E.F.

156.     E.F. struggles socially because she does not have age-appropriate peers without disabilities to serve as behavioral models.

157.     Ms. Farrell has repeatedly asked that E.F. be placed in a less restrictive classroom setting so that E.F. can have more appropriate role models but has been told that E.F. must remain where she is, partly because E.F. is a role model for the other students.

158.     Because she has had so little interaction with her peers without disabilities, E.F. is shy and socially awkward around students her age.

159.     E.F. is also struggling academically and not receiving appropriate academic instruction.

160.     When E.F. was fourteen, DOE staff told Ms. Farrell that the focus for E.F. would be on vocational skills, not academic achievement.

161.     A significant portion of E.F.'s day is now spent on vocational instruction, which often includes mopping, sweeping, picking up recycling, making office furniture, and setting tables at a catering facility.

162.     For the past four years, E.F. has been at a first-grade level in both reading and math even though E.F. is currently eighteen years old.

163.     E.F. does not receive report cards but instead receives reports on her progress toward her IEP goals.

164.     Ms. Farrell believes that the school gives E.F. artificially easy goals to ensure she can meet them despite the fact that Ms. Farrell has advocated for E.F. to be given more ambitious goals.

165.     Ms. Farrell would prefer for E.F. to attend the District 31 high school in her neighborhood, Tottenville High School, but appropriate supports would need to be in place for her.

166.     E.F.'s past experience with P.S. 60 makes Ms. Farrell fear sending her back to a community school.

167.     E.F. could be educated in a District 31 community school.

### *A.S.*

168.     A.S. is nine years old, is autistic, has Attention Deficit/Hyperactivity Disorder ("ADHD"), and has had an IEP since he was three years old.

169.     A.S. attended Staten Island District 75 school P.S. 373 until March 3, 2020.

170.     A.S. was recently transferred to P.S. 36 in District 31, a Staten Island community school, but remains at risk for transfer back to a Staten Island District 75 school.

171.     A.S. enjoys sports, including swimming, Zumba, and taekwondo, and also takes singing and drum lessons.

172.     A.S. is helpful, complimentary, and eager to make friends with his peers.

173.     For the first half of kindergarten, A.S. attended P.S. 4, a District 31 school within walking distance from his home.

174.     On the first day of kindergarten, and almost every day thereafter, staff from P.S. 4 called A.S.'s mother, Ms. Pustovalova, and told her to come to the school to pick up A.S. because of his behavior.

175.      P.S. 4 suspended A.S. multiple times over the four months that he attended P.S 4.

176.     Because of his suspensions and behavioral challenges, A.S. struggled academically at P.S. 4.

177.     Several months into A.S.'s kindergarten year, a DOE official called Ms. Pustovalova and said that there would now be an official "DOE suspension process" for A.S. so that he was not spending the day in the principal's office; instead, after being suspended, A.S. would immediately be transported by the school off site to a different school.

178.     While A.S. was never transported off site for his multiple suspensions, the possibility of this scared Ms. Pustovalova, because A.S. was just five years old.

179.     P.S. 4 did not offer any appropriate solutions or plans to address A.S.'s behavior—as it was legally required to do—beyond sending A.S. to a Staten Island District 75 school.

180.     Staff at P.S. 4 made it clear to Ms. Pustovalova that they would continue to suspend A.S.

181.     Ms. Pustovalova asked P.S. 4 staff to provide A.S. with more intensive supports, including working with a school psychologist with specialized expertise, but the school refused.

182.     In December of his kindergarten year, P.S. 4 officials recommended that A.S. attend P.S. 373, a Staten Island District 75 school.

183.     Ms. Pustovalova worried about the effect of the frequent suspensions on A.S.'s academic and emotional development, and the amount of work she was missing due to constantly picking A.S. up early from school.

184.     Ms. Pustovalova was told by a DOE official that Staten Island District 75 schools did not suspend students.

185.     Ms. Pustovalova felt that she had no option other than to send A.S. to a Staten Island District 75 school because she felt that A.S. was being forced out of P.S. 4 by school administrators.

186.     In January of his kindergarten year, A.S. began attending P.S. 373.

187.     Because the DOE placed A.S. at P.S. 373, he had to leave his house for an hour-long commute at 6:55 a.m.

188.     A.S. was not challenged academically at P.S. 373 because for several years most other students in his classroom were younger and further behind in both academics and life skills.

189.     Because P.S. 373 places little emphasis on academic skills, A.S. received little engaging instruction and almost no homework.

190.    A.S.'s reading level regressed significantly while attending P.S. 373, as he was reading at level "E" when he began at P.S. 373, but was tested four months later at level "A," four levels below his previous "E" reading level.

191.    Troubled by A.S.'s academic regression, Ms. Pustovalova began paying a private reading tutor to improve his reading.

192.    Only Staten Island District 75 students with disabilities attend P.S. 373, such that A.S. had no opportunity to be educated with non-Staten Island District 75 students, including students without disabilities.

193.    There are no recreational or extracurricular activities provided at P.S. 373, so Ms. Pustovalova was forced to pay for A.S. to participate in karate, swimming, and singing lessons to give him the opportunity to interact with his non-disabled peers.

194.     At Ms. Pustovalova's insistence, A.S. was observed in December 2019 by a professional in his P.S. 373 classroom.

195.    Because the observation did not note any serious behaviors or anything indicating A.S. needed to be segregated in a Staten Island District 75 classroom, Ms. Pustovalova was able to advocate at A.S.'s January 2020 IEP meeting for him to return to a community setting.

196.    A.S. began attending P.S. 36, a community school located five minutes from his home, on March 4, 2020.

197.    Prior to A.S. beginning at P.S. 36, Ms. Pustovalova contacted the school psychologist to ensure that A.S. would continue to receive his IEP services and that his BIP would remain unchanged.

198. The P.S. 36 school psychologist was skeptical of A.S.'s ability to attend P.S. 36 from the start and stated that if he had any extreme behaviors, they would not be able to handle him at P.S. 36.

199. The day before A.S. was supposed to begin attending P.S. 36, Ms. Pustovalova tried to schedule an IEP meeting to ensure a smooth transition, but her concerns were brushed off.

200. Ms. Pustovalova is very concerned that P.S. 36 does not have adequate supports and services in place to accommodate A.S. and believes it is likely that the DOE will quickly attempt to push him back into a Staten Island District 75 placement.

201. Ms. Pustovalova has also requested that A.S. receive Special Education Teacher Support Services ("SETSS"), the DOE's term for specially designed instruction for special education students in regular general education classrooms, but has been repeatedly denied these services.

202. Due to the DOE's illegal policies and failure to provide students with appropriate services and supports, A.S. remains at significant risk for transfer back to District 75.

### *L.P.*

203. L.P. is fourteen years old, is autistic, has ADHD, has learning disabilities in math and written expression, and has had an IEP since he was three years old.

204. L.P. is currently a freshman at Tottenville High School, a District 31 school, but remains at risk for a transfer to Staten Island District 75.

205. L.P. loves to spend time with his family and friends, and he is very friendly and empathetic towards others.

206. L.P. also has a service dog who provides L.P. with emotional support.

207. L.P.'s favorite subjects are science and history.

208. In his spare time, L.P. enjoys reading books on ancient history and mythical gods and doing STEM activities such as building robots.

209. From kindergarten through fifth grade, L.P. attended the Nest Program—an application-only program for autistic students that often has a waitlist—at P.S. 4, in District 31.

210. The Nest Program integrates autistic students with students without disabilities in a class co-taught by one special education teacher and one general education teacher.

211. When L.P. was in the Nest Program, L.P. also received individualized supports through SETSS for math and English Language Arts ("ELA"), as well as support from a paraprofessional aide.

212. While in the Nest program in the second grade, L.P. started to exhibit disruptive behaviors, which intensified through the third and fourth grade.

213. L.P.'s mother, Ms. Petri, learned that instead of receiving supports for his behavior, L.P. was often placed in a separate break area, closed off from the rest of his classroom, for long periods of time with no educational services.

214. Ms. Petri removed L.P. from the Nest Program due to his lack of progress.

215. When L.P. entered I.S. 24 in the sixth grade, he was placed in the Transition Assistance Program ("TAP") in an integrated classroom with students without disabilities.

216. At the time he entered the program, L.P.'s IEP included supports through SETSS for math and ELA and support from a paraprofessional aide.

217. L.P. also received Occupational Therapy and Speech Therapy.

218.     Ms. Petri was told that if she wanted L.P. to remain in the integrated TAP program, L.P. would have to give up his individualized supports for math and ELA and his paraprofessional aide, as these services were not available in the TAP program.

219.     Upon information and belief, the DOE's decision to remove these supports was based on its decision not to offer such supports in community schools, rather than on L.P.'s specific needs.

220.     Consequently, L.P.'s supports for ELA and math and his paraprofessional support were removed from his IEP.

221.     After the supports were removed, L.P. began failing classes and exhibiting disruptive behaviors.

222.     Ms. Petri suspected that L.P.'s teachers and aides lacked training in how to support students with disability-related behaviors like L.P.

223.     Instead of updating L.P.'s evaluations, training staff, and providing him the supports that he needed, L.P. was unilaterally removed from his history class in the TAP program and placed in a segregated history class for autistic students, a decision that was made without an IEP meeting and without consent from L.P.'s parents.

224.     When Ms. Petri expressed her concerns about this transfer, L.P. was placed back into the integrated history class pursuant to the recommendations on his IEP.

225.     After returning to the integrated history class L.P. then received a number of additional suspensions due to his behaviors.

226.     On February 14, 2019, Ms. Petri participated in an IEP meeting where she expressed her concerns about L.P.'s behaviors and academic difficulties and requested that he receive additional services.

227.    After the IEP meeting, Ms. Petri was told by school personnel that the requested services would not be provided.

228.    Ms. Petri wrote a letter expressing her disagreement with the refusal to consider these services and requesting an independent FBA and BIP.

229.    In order to get the services L.P. needed to ensure he remained in his community school, Ms. Petri made a formal request for mediation pursuant to the IDEA.

230.    While Ms. Petri was advocating for services to keep L.P. in his current general education class, Ms. Petri was told by District 31 staff on more than one occasion that L.P. would be better served in a more restrictive segregated class environment.

231.    Only after Ms. Petri requested mediation to resolve her concerns did District 31 finally agree to provide L.P. with his individualized supports and re-enroll in the TAP program, albeit in a different school, L.S. 34.

232.    Due to the DOE's failure to provide L.P. with appropriate services and supports, L.P. remains at risk for transfer to Staten Island District 75.

### *Disability Rights New York*

233.    Disability Advocates, Inc. is an independent non-profit corporation organized under the laws of the State of New York.

234.    Disability Advocates, Inc. is authorized to conduct business under the name Disability Rights New York ("DRNY").

235.    DRNY is a Protection and Advocacy ("P&A") system, as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15041 et seq., the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.*, and the Protection and Advocacy of Individual Rights

Act ("PAIR Act"), 29 U.S.C. § 794e *et seq.*, with offices in the State of New York located at: 25 Chapel Street, Suite 1005, Brooklyn, NY 11201; 725 Broadway, Suite 450, Albany, NY 12208; and 44 Exchange Blvd., Suite 110, Rochester, NY 14614.

236.    In 1972, the horrific conditions of abuse and neglect at the Willowbrook State School in Staten Island, an institution that was supposed to provide care and support to children and adults with intellectual and developmental disabilities, were exposed to the public.

237.    In response to this abuse and neglect and in recognition that these individuals at Willowbrook State School had no means of seeking redress, Congress passed the Developmental Disabilities Assistance and Bill of Rights Act of 1975 ("DD Act"), 42 U.S.C. § 6000, et seq. (repealed and replaced by 42 U.S.C. § 15001, et seq.).

238.    Under the DD Act, a state that accepts federal financial assistance for services for individuals with developmental disabilities is required to have "a system to protect and advocate the rights of individuals with developmental disabilities."42 U.S.C. § 15043(a)(1).

239.    P&A systems were created to, among other things, pursue legal remedies, "to ensure the protection of, and advocacy for, the rights of such individuals." 42 U.S.C. § 15043(a)(2)(A)(i).

240.    The DD Act provides that, "[n]othing in this subchapter shall preclude a system from bringing a suit on behalf of individuals with developmental disabilities against a State, or an agency or instrumentality of a State." 42 U.S.C. § 15044(b).

241.    In 1985, Congress enacted the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), to protect and enforce the rights of individuals with mental illness.

242.     Like the DD Act, the PAIMI Act empowers P&A systems to "pursue administrative, legal and other appropriate remedies to ensure the protection of individuals with mental illness" and "the enforcement of the Constitution and Federal and State statutes." 42 U.S.C. §§ 10805(a)(1)(B), 10801(b)(2)(A).

243.     The federal regulations implementing PAIMI specifically provide that a P&A system may "bring[] lawsuits in its own right to redress incidents of abuse or neglect, discrimination, and other rights violations." 42 C.F.R. § 51.6(f).

244.     On May 7, 2013, Governor Cuomo designated DRNY as New York's P&A system. N.Y. Exec. Law § 558(b).

245.     As New York State's P & A system, DRNY is expressly authorized to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with disabilities. 42 U.S.C. § 15043(a) (2)(A) (i); N.Y. Exec. Law § 558(b).

246.     Pursuant to the authority vested in it by Congress to protect the rights of individuals with disabilities, DRNY brings claims on behalf of students with disabilities who receive education in a Staten Island District 75 school or classroom or are at significant risk of being transferred to a Staten Island District 75 school or classroom.

## CAUSES OF ACTION

### Count I

**Violation of Americans with Disabilities Act**
**(42 U.S.C. § 12101, *et seq.*)**

247.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

248. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity." 42 U.S.C. § 12132.

249. A public entity must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

250. A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

251. The Defendants were, at all times relevant to this action, and currently are, "public entities" within the meaning of Title II of the ADA.

252. Defendants provide "services, programs and activities" including educational programs, services, and activities for Staten Island District 75 students.

253. The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. *See* 42 U.S.C. § 12102(2).

254. A "qualified individual with a disability is an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

255. Each of the individual Named Plaintiffs and Plaintiff Class Members were at all relevant times to this action, and are currently, "qualified individuals with disabilities" within the meaning of Title II of the ADA.

256. Each of the individual Named Plaintiffs and Plaintiff Class Members attend or are at significant risk of attending Staten Island District 75 schools and classrooms and are qualified—with or without reasonable modification—to participate in the programs, services, and activities provided by the DOE.

257. Defendants have discriminated against each of the individual Named Plaintiffs and Plaintiff Class Members by needlessly segregating them in Staten Island District 75 schools when they could be educated in their community schools with appropriate instruction, services, and supports.

258. Through the acts and omissions described herein, Defendants' failure to provide the proper supports and services in the most integrated setting, resulting in unnecessary segregation of students with disabilities into Staten Island District 75 placements and denial of equal educational opportunities to these students, violates Title II of the ADA by:

i) Denying the Named Plaintiffs and Class Members the opportunity to participate in and benefit from educational services and opportunities that are equal to those afforded other students;

ii) Denying the Named Plaintiffs and Plaintiff Class Members services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;

iii) Denying the Named Plaintiffs and Plaintiff Class Members the opportunity to receive educational programs and services in the most integrated setting appropriate to their needs, which is defined as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible," 28 C.F.R. pt. 35, App. A;

iv) Denying the Named Plaintiffs and Plaintiff Class Members the reasonable modifications to their policies, practices, and procedures governing the provision of services they need to avoid discrimination; and

v) Utilizing methods of administration that "have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs with respect to the Named Plaintiffs and Class Members.

259.     Pursuant to 42 U.S.C. § 12133, the Named Plaintiffs and Class Members are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 12205.

## Count II

### Violation of Section 504 of the Rehabilitation Act of 1973
### (29 U.S.C. § 794)

260.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

261.     Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

262.     Defendants were at all times relevant to this action, and are currently, recipients of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act of 1973.

263.     Defendants provided and provide a "program or activity" where "program or activity" is described as "all the operations of" the recipient, which includes the educational programs and activities in schools in District 75.  29 U.S.C. § 794(b)(2)(B).

264.     The individual Named Plaintiffs and Class Members were, at all times relevant to this action, and are currently "otherwise qualified individuals with disabilities" within the meaning of Section 504 of the Rehabilitation Act of 1973.

265.     The individual Named Plaintiffs and Plaintiff Class Members are enrolled in District 75 schools in Staten Island, or are at significant risk of such enrollment, and are qualified—with or without reasonable modification—to participate in the DOE's educational services.

266.     Defendants have violated the rights of the Named Plaintiffs and Class Members secured by Section 504 of the Rehabilitation Act of 1973 and its implementing regulations.  *See* 28 C.F.R. § 41.1; 34 C.F.R. part 104.

267.     Through the acts and omissions described herein, Defendants' failure to provide appropriate instruction, supports, and services in the most integrated setting, resulting in unnecessary segregation of students into Staten Island District 75 and the denial of equal educational opportunity to these students, violates Section 504 by:

i)   Denying Named Plaintiffs and Plaintiff Class Members the opportunity to participate in and benefit from educational services that are equal to those afforded other students;

ii)  Denying Named Plaintiffs and Plaintiff Class Members services that are as effective as those provided to other students;

iii) Denying Named Plaintiffs and Plaintiff Class Members the "opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs";

iv) Denying Named Plaintiffs and Plaintiff Class Members the reasonable modifications to their policies, practices, and procedures governing the provision of services they need to avoid discrimination; and

v) Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs with respect to the Named Plaintiffs and putative Class Members.

268.    Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to declaratory and injunctive relief and to reasonable attorneys' fees and costs incurred in bringing this action.

## Count III

### Violation of Individuals with Disabilities Education Act
### (20 U.S.C. § 1400, *et seq.*)

269.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

270.    Under the Individuals with Disabilities Education Act, students with disabilities are entitled to receive a free appropriate public education including special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living. 20 U.S.C. § 1400(d)(1)(a).

271.    The IDEA defines a student with a disability as a child:

"with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . . orthopedic impairments, autism, traumatic brain injury, other health

> impairments, or specific learning disabilities . . . who, by reason
> thereof, needs special education and related services."

20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8(a)(1).

272.    Each of the individual Named Plaintiffs and Class Members have had at all times

relevant to this action a disability as defined under the IDEA.

273.    As operators of a local educational agency ("LEA"), the Defendants have a duty

to provide FAPE to all students with disabilities in New York City in accordance with the

requirements of IDEA.  *See* 34 C.F.R. § 300.2(b)(1)(ii).

274.    As defined by IDEA, FAPE includes "special education and related services that .

. . have been provided at public expense, under public supervision and direction, and without

charge . . . [and that] meet the standards of the State educational agency." 20 U.S.C. § 1401(9).

275.    The IDEA further implores that:

> [t]o the maximum extent appropriate, children with disabilities . . .
> are educated with children who are not disabled, and special
> classes, separate schooling, or other removal of children with
> disabilities from the regular educational environment occurs only
> when the nature or severity of the disability of a child is such that
> education in regular classes . . . cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5).

276.    IDEA provisions identify and require public entities to provide students a FAPE

in the LRE.

277.    Through their policies, procedures, and practices relating to their administration

of Staten Island School District 75, Defendants fail to meet their obligations under IDEA and

state implementing regulations including, but not limited to:

i)   Defendants do not provide FAPE in the LRE to the individual Named Plaintiffs and

     Class Members with disabilities because they do not ensure that appropriate services

and supports are available for students with disabilities in their community schools; and

ii) Defendants' creation and administration of a segregated school district, ensuring that students with disabilities are isolated from their non-disabled peers for the entire school day, violates their obligation to ensure that Staten Island District 75 students are educated in the LRE.

278.    Defendants have violated and continue to violate the rights secured by 20 U.S.C. §§ 1400 *et seq.* and its implementing regulations at 34 C.F.R. §§ 300 *et seq.*

279.    Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs incurred in bringing this action under 20 U.S.C. § 1415(i)(3).

## Count IV

### Violation of the New York City Human Rights Law
### (N.Y.C. Admin. Code § 8-101, *et seq.*)

280.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

281.    The New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, *et seq.*, provides that

> [i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee or any place or provider of public accommodation because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . .

N.Y.C. Admin. Code § 8-107(4)(a).

282.     NYCHRL provides that Persons include all "natural persons, proprietorship, partnerships, associations, group associations, organizations, governmental bodies or agencies, corporations [and] legal representatives . . . ."  N.Y.C. Admin. Code § 8-102(1).

283.     Educational institutions, defined as "kindergartens, primary and secondary schools, academies . . . and all other educational facilities," like those operated by Defendants, are contemplated within the definition of public accommodations in the NYCHRL.  N.Y.C. Admin. Code § 8-102(8).

284.      Public education services constitute a service, accommodation, advantage, or privilege that is offered to the general public within the meaning of N.Y.C. Admin. Code § 8-102(9).

285.     Defendants DOE and Carranza, the "managers" of the educational institutions, as "governmental bodies or agencies" are "persons" within N.Y.C. Admin. Code § 8-102(1).

286.     Through the segregation of Staten Island District 75 students due to the failure to provide appropriate disability-related services in community schools and the denial of appropriate academic and extracurricular activities, Defendants unlawfully discriminate against the Named Plaintiffs and members of the putative class. N.Y.C. Admin. Code § 8-107(4)(a).

287.     Defendants violate § 8-107(4)(a) by denying the Named Plaintiffs and putative Class Members access to a service, accommodation, privilege, or advantage that is otherwise available to students without disabilities, because students with disabilities require these services to have equal access to education.

288.     Defendants violate N.Y.C. Admin. Code § 8-107(15) which mandates that covered entities must "make reasonable accommodation to enable a person with a disability to . .

. enjoy the right or rights in question, provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15)

289.    Defendants are aware that the individual Named Plaintiffs and Class Members have disabilities because they have IEPs.

290.    Defendants' failure to ensure that the Named Plaintiffs and Class Members receive the services and supports they need to remain in an integrated educational setting is a violation of N.Y.C. Admin. Code § 8-107(15)'s reasonable accommodation mandate.

291.    As a direct and proximate result of Defendants' violations of the NYCHRL, the Named Plaintiffs and Class Members have been injured as set forth herein.

292.    Defendants' conduct constitutes an ongoing and continuous violation of the NYCHRL entitling Plaintiffs to injunctive relief and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

293.    *Wherefore*, Named Plaintiffs, individually and on behalf of the Class Members they represent, ask the Court to:

i.    Declare that the Defendants' discriminatory conduct as alleged herein violates the ADA, Section 504 of the Rehabilitation Act, the IDEA, and the NYCHRL;

ii.    Permanently enjoin Defendants from violating the ADA, Section 504 of the Rehabilitation Act, the IDEA, and the NYCHRL;

iii.    Certify this matter as a class action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure with the class defined as set forth in paragraph 34 above;

iv.    Appoint the Named Plaintiffs as class representatives and their attorneys as class counsel;

v. Order Defendants to develop and implement a remedial plan that includes new practices, policies, and procedures to ensure that all students in the Plaintiff Class have the opportunity to be educated in the most integrated setting appropriate to their needs;

vi. Retain jurisdiction of this case until Defendants have complied with the orders of this Court and until there is a reasonable assurance that Defendants will continue to comply in the future, absent continuing jurisdiction;

vii. Award Plaintiffs' attorneys' fees and costs, as provided by statute and law; and

viii. Award any such other relief as the Court finds just and proper.

RESPECTFULLY SUBMITTED this 26th day of January, 2021.


Lewis Bossing*
Ira Burnim*
The Bazelon Center for Mental Health Law
1090 Vermont Avenue NW, Suite 220
Washington, DC. 20005-4900


Emily Seelenfreund
Ptahra Jeppe
Stuart Seaborn*
Disability Rights Advocates
655 Third Avenue, 14th Floor
New York, NY 10017

Julie Michaels Keegan
Jennifer Feeley
Disability Rights New York
725 Broadway #450
Albany, NY 12207


Pete Baldwin
Lucas Michelen
Faegre Drinker Biddle & Reath LLP
1177 6th Avenue, 41st Floor
New York, NY 10036


Michael Crosson*
Faegre Drinker Biddle & Reath LLC
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103 USA


Gerald Hartman*
The Law Offices of Gerald Hartman
3607 Whispering Lane
Falls Church, VA 22041

*Attorneys for Plaintiffs*

\* motions for *pro hac vice* admission to be filed