UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

E.F., a minor, by and through her parent and natural
guardian, Marie Farrell; A.S., a minor, by and
through his parent and natural guardian, Mariya
Pustovalova; L.P., a minor, by and through his
parent and natural guardian, Jennifer Petri, on
behalf of themselves and a class of those similarly
situated, and Disability Rights New York,

                                        Plaintiffs,

                    v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION; THE CITY OF NEW YORK;
RICHARD CARRANZA, in his official capacity as
Chancellor of the New York City Department of
Education,

                                        Defendants.

**MEMORANDUM AND ORDER**

21-cv-419 (LDH)

---

LaSHANN DeARCY HALL, United States District Judge:

Minors E.F., A.S., and L.P. (the "Individual Plaintiffs"), and Disability Rights New York

("DRNY") (collectively, with the Individual Plaintiffs, "Plaintiffs") bring this putative class

action on behalf of themselves and similarly situated students, against the New York City

Department of Education (the "DOE"), the City of New York, and Richard Carranza, in his

capacity as Chancellor of the DOE (together with the DOE and the City, "Defendants") for

violations of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act

("Section 504"), the Individuals with Disabilities Education Act ("IDEA"), and the New York

City Human Rights Law ("NYCHRL").

1

# BACKGROUND[1]

The DOE operates the public school system in all five boroughs of New York City.
(Compl. ¶ 56., ECF No. 1.)  In total, the DOE provides educational programs and services to
well over one million students in 1,866 schools.  (*Id.*)  Approximately 227,000 students, nearly
one quarter of the entire New York student population, receive special education under the
IDEA.  (*Id.* ¶ 57).  The system is divided into thirty-two community school districts, which
provide educational services largely based on geographic criteria.  (*Id.* ¶ 58.)  District 31 is the
only community school district on Staten Island.  (*Id.* ¶ 66.)  District 31 is comprised of over 75
different schools and serves approximately 62,000 students.  (*Id.* ¶ 66.)  In addition to the
community school districts, the DOE operates District 75 to serve as a citywide school district
for students with autism spectrum disorders, significant cognitive delays, sensory impairments,
emotional disturbances, and other disabilities.  (*Id.* ¶ 59.)  On Staten Island, District 75 is
comprised of four schools with roughly 2,000 students.  (*Id.* ¶¶ 4, 65, 67.)  Some of the Staten
Island District 75 schools are standalone campuses, while other District 75 schools are co-located
on the same campuses as District 31 schools.  (*Id.* ¶ 68.)  Additionally, while many students with

---

[1] The following facts taken from the complaint are assumed to be true for the purpose of this
memorandum and order, unless otherwise stated.  Generally, a Court may not consider matters
outside the pleadings on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).
*See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  However, documents attached to the
complaint or incorporated therein by reference are deemed part of the pleading and may be
considered.  *Id.*  Moreover, a "document 'upon which [the complaint] *solely* relies and which is
*integral to the complaint*' may be considered by the court in ruling on such a motion."  *Id.*
(quoting *Cortec Indus., Inc. v. Sun Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).  Finally,
matters of public record may be properly considered, *see Blue Tree Hotels Inv. (Can.), Ltd. v.
Starwood Hotels & Resorts Worldwide*, 369 F.3d 212, 217 (2d Cir. 2004), and the Court is
permitted to reject those allegations that are contradicted by matters of public record, *see
Fowlkes v. Rodriguez*, 584 F. Supp. 2d 561, 574–75 (E.D.N.Y. 2008).

disabilities attend a District 75 school, some disabled students attend community schools in District 31.  (*Id*. ¶ 71.)

### A. The DOE School System

Plaintiffs allege that students with disabilities at standalone District 75 campuses spend each school day "totally segregated" from students without disabilities.  (Compl. ¶ 75.)  Even disabled students at co-located campuses "spend all or almost all of their school day segregated from students without disabilities."  (*Id*. ¶ 74.)  Plaintiffs also allege that many of District 75's "segregated campuses lack essential educational facilities such as libraries, cafeterias, gymnasiums, or playgrounds."  (*Id*. ¶ 76.)

According to the Complaint, most District 75 students are "denied the opportunity to be educated in the community schools, magnet or specialized schools, public charter schools, and other schools available to their non-disabled peers."  (*Id*. ¶ 84.)  Once a student is placed in a District 75 school, it is difficult for the student to return to a District 31 school because "the DOE's funding of a segregated system precludes the provision of an appropriate continuum of services in community schools."  (*Id*. ¶ 83.)  As a result, District 75 students are denied the "many positive benefits of being educated in classrooms with their peers without disabilities, including access to a curriculum that meets the requirements of a regular high school diploma, higher educational expectations set by both teachers and peers, and learning appropriate social skills and behaviors modeled by classmates without disabilities."  (*Id*. ¶ 85.)  Additionally, the DOE does not systemically provide District 75 students "with the same educational tools, resources, technology, and other means of engaging students in learning as their non-disabled peers in District 31."  (*Id*. ¶ 89.). Because of the "less formalized" academic instruction, District 75 students "may remain at the same academic level for years, or even regress."  (*Id*. ¶ 88.)

Plaintiffs also allege that many District 75 students "have no or minimal access to after-school or extracurricular activities, such as clubs, sports teams, or other non-academic enrichment opportunities, as compared to their peers in DOE community schools, thereby denying them the opportunity to develop ties to a local neighborhood and community." (*Id.* ¶ 92.) Indeed, students in District 75 classrooms co-located in community schools cannot take electives or participate in extracurricular activities at the community school due to transportation barriers. (*Id.* ¶ 93.)

Finally, Plaintiffs allege that the academic achievement data that the DOE provides indicates that many District 75 students "fail to achieve basic learning standards." (*Id.* ¶ 94.) District 75 students "rarely have a chance to earn the standard diploma that other students in New York City public schools are awarded." (*Id.* ¶ 95.) Ultimately, Plaintiffs maintain that the DOE "continue[s] to maintain a segregated system of education for the students" instead of developing and investing resources to serve students with disabilities in District 31 community schools. (*Id.* ¶ 128.)

**A. Individual Plaintiffs**

*i.      Plaintiff E.F.*

Plaintiff E.F. is an eighteen-year-old student who has had an individual education plan ("IEP") since she was four years old. (Compl. ¶ 134.) From pre-kindergarten through first grade, E.F. attended a private school for autistic children. (*Id.* ¶ 140.) In E.F.'s second-grade year, her mother transferred her to a District 31 school. (*Id.* ¶ 141.) E.F. alleges that because her District 31 school "did not help [her] engage with other students, her classmates shunned and isolated her." (*Id.* ¶ 145.) Additionally, E.F.'s teacher "treated her harshly, sent home notes about her behavior, and punished her for small outbursts." (*Id.* ¶ 146.) E.F. also did not receive

4

appropriate behavioral support or academic supports at her District 31 school, including certain speech therapy support listed on her IEP.  (*Id.* ¶ 147.)

E.F. then transferred to a co-located District 75 school, following concerns from her mother that she was not receiving appropriate academic support at her District 31 school.  (*Id.* ¶ 152–53.)  E.F. currently attends a Staten Island District 75 school at its co-located site on the campus of a community high school.  (*Id.* ¶ 153.)

E.F. has had limited interaction with her peers without disabilities.  (*Id.* ¶ 156.)  As a result, E.F. is shy and socially awkward around students her age.  (*Id.* ¶ 158.)  Indeed, E.F. "struggles socially because she does not have age-appropriate peers without disabilities to serve as behavioral models."  (*Id.* ¶ 156.)  Additionally, E.F. struggles academically and has not received appropriate academic instruction.  (*Id.* ¶ 159.)  Over the past four years, E.F. has tested at a first-grade level in both reading and math. E.F. is eighteen years old.  (*Id.* ¶ 162.)

        *ii.     Plaintiff A.S.*

A.S. is a nine-year-old student with ADHD.  (Compl. ¶ 168.)  He has had an IEP since he was three years old.  (*Id.*)  A.S. began kindergarten at a District 31 school.  (*Id.* ¶186.)  Over the first four months of kindergarten, A.S. was suspended multiple times.  (*Id.* ¶ 175.)  Because of his suspensions and behavioral challenges, A.S. struggled academically.  (*Id.* ¶ 176.)  Staff at A.S.'s school made clear to his mother that they would continue to suspend A.S.  (*Id.* ¶ 180.)  A.S.'s mother believed that she had no option other than to transfer A.S. to a District 75 school, as she felt that school administration forced A.S. out of his community school.  (*Id.* ¶ 185.)  In January of his kindergarten year, A.S. transferred to a District 75 school.  (*Id.* ¶ 186.)

According to the complaint, A.S. was not challenged academically at his District 75 school.  (*Id.* ¶ 188.)  Specifically, for several years, the other students in his classroom were

"younger and further behind in both academics and life skills." (*Id.*)  As a result, A.S. did not

receive engaging instruction or homework, which resulted in a significant regression in his

reading level.  (*Id.* ¶¶ 189–190.)

Because only students with disabilities attended A.S.'s District 75 school, A.S. had no

opportunity to be educated with students without disabilities.  (*Id.* ¶ 192.)  There were no

recreational or extracurricular activities provided at his District 75 school.  (*Id.* ¶ 193.)  This

forced A.S.'s parents to pay for "karate, swimming, and singing lessons to give him the

opportunity to interact with his non-disabled peers."  (*Id.* ¶ 193.)

In December of 2019, A.S. had a classroom observation at his District 75 school.  (*Id.* ¶

194.)  As a result of his observation, it was determined that A.S. did not require an education in a

District 75 school.  (*Id.* ¶ 195.)  Thus, in March 2020, A.S. was enrolled in a District 31

community school near his home.  (*Id.* ¶ 196.)  A.S.'s parent is "very concerned that [the

District 31 school] does not have adequate supports and services in place to accommodate A.S.

and believes it is likely that the DOE will quickly attempt to push him back into a Staten Island

District 75 placement."  (*Id.* ¶ 200.)

     iii.   *Plaintiff L.P.*

Plaintiff L.P. is a fourteen-year-old student with ADHD.  (Compl. ¶ 203.)  He has had an

IEP since he was three years old.  (*Id.*)  L.P. has attended District 31 schools since kindergarten.

(*Id.* ¶ 209.)  L.P.'s mother learned that between the second and fourth grade, "instead of

receiving supports for his behavior, L.P. was often placed in a separate break area, closed off

from the rest of his classroom, for long periods of time with no educational services."  (*Id.* ¶

213.)  Additionally, L.P. received "a number of additional suspensions due to his behaviors."

(*Id.* ¶ 225.)

In sixth grade, L.P. was placed in an integrated transition assistance program ("TAP") with students without disabilities. (*Id*. ¶ 215.) L.P. was subsequently removed from TAP. (*Id*. ¶ 223.) In 2019, L.P.'s mother voiced concerns about the behavioral and academic support L.P. was receiving at his District 31 school, including his removal from TAP. (*Id*. ¶ 226.) Shortly thereafter, L.P.'s mother requested formal mediation pursuant to the IDEA to ensure L.P. remained at his community school. (*Id*. ¶ 231.) Following the request for mediation, L.P. was re-enrolled in a TAP program. (*Id*.)

L.P. is currently a freshman at a District 31 school. (*Id*. ¶ 204.) L.P. remains at risk for transfer to a District 75 school because of the DOE's "failure to provide L.P. with appropriate services and supports." (*Id*. ¶ 232.)

    *iv.*    *Plaintiff DRNY*

Plaintiff DRNY is a non-profit Protection and Advocacy system (P&A system). As a P&A system, they are defined under the Developmental Disabilities Assistance and Bill of Rights Act, the Protection and Advocacy for Individuals with Mental Illness Act of 1986, and the Protection and Advocacy of Individual Rights Act. (Compl. ¶ 235.) As a P&A system, DRNY is expressly authorized to pursue legal, administrative, and other remedies to ensure the protection of, and advocacy for, the rights of individuals with disabilities. (*Id*. ¶ 245.)

## STANDARD OF REVIEW

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff bears the burden of establishing beyond a preponderance of the evidence that subject-matter jurisdiction exists. *Id.* "In reviewing a Rule 12(b)(1) motion to dismiss, the court 'must accept as true all material factual allegations in the complaint, but [the court is] not to draw inferences from the complaint favorable to plaintiff[ ].'" *Tiraco v. New York State Bd. of Elections*, 963 F. Supp. 2d 184, 190 (E.D.N.Y. 2013) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004)). Further, "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113.

## DISCUSSION

### A.  Exhaustion of Administrative Remedies Under the IDEA

The IDEA provides for federal court review of administrative determinations of whether a student with a disability receives a Free Appropriate Public Education ("FAPE"). *See* 20 U.S.C. § 1415(a). As defined in the IDEA, a FAPE comprises "special education and related services"— "tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154,, 748–49 (2017) (quoting 20 U.S.C. §§ 1401(9), (26), (29)).

Section 1415(l) of the IDEA requires that "before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter." 20 U.S.C. § 1415(l). Accordingly, a Plaintiff must exhaust

8

administrative remedies under the IDEA before bringing suit.[2]  Indeed, "[a] plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction." *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002). Thus, a "court deciding whether § 1415(l) applies must therefore examine whether a plaintiff's complaint . . . seeks relief for the denial of an appropriate education." *Fry*, 580 U.S. at 755.

The Supreme Court's decision in *Fry* outlines the framework for determining the scope of the IDEA's exhaustion requirement.  580 U.S. 154.  *Fry* holds that IDEA exhaustion is not required "when the gravamen of the plaintiff's suit is something other than the denial of [FAPE]."  *Id.* at 748.  However, if a lawsuit challenges the denial of FAPE, even when brought under a statute other than the IDEA, the plaintiff must comply with the IDEA's exhaustion requirement.  *Id.* at 754.  Thus, Section 1415(l) "requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way."  *Id.* at 755.

Here, Plaintiffs purport to bring three independent federal claims; one under each the ADA, Section 504, and the IDEA.  Defendants maintain that notwithstanding Plaintiffs' characterization of the claims, the gravamen of this suit relates to Defendants' failure to provide a FAPE, which is subject to the IDEA's exhaustion requirement and which Plaintiffs have failed to meet.  The Court agrees.

Admittedly, the Court finds Plaintiffs' complaint to be confusing, at best.[3]  It purports to bring claims on behalf of "students with disabilities who receive education in a Staten Island

---

[2] Here, there is no allegation that Plaintiffs exhausted their administrative remedies under the IDEA.

[3] Defendants urge the Court to dismiss the complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure. Their argument is not altogether unpersuasive.  Indeed, like Defendants, the Court found itself concluding "exactly what the plaintiffs want the court to do is unclear."  (Defs.' Mot. Dismiss at 1.)  However, for the reasons set forth herein, the Court lacks subject matter jurisdiction, and it need not make any finding on Defendants' Rule 8 motion.

District 75 School or classroom or are at a significant risk of being placed in a Staten Island

District 75 School or classroom." (Compl. ¶ 34.) Yet, of the three named Plaintiffs, only one,

E.F., actually attends a District 75 school. A.S. currently attends a community school, at which

he was placed after an individualized observation conducted in December 2019 did not indicate

any serious behaviors requiring placement at a District 75 school. (Compl. ¶¶ 194–195.)

Likewise, L.P. too is at community school. Indeed, from Plaintiffs' allegations, L.P. has never

been placed in a District 75 school or classroom. Moreover, contrary to Plaintiffs' naked

assertions, there are no allegations to support the notion that either A.S. or L.P. are "at risk" of

being placed at a District 75 school. At least with respect to L.P., the allegations belie any such

conclusion. As set out in the complaint, L.P.'s mother successfully mediated with the DOE to

ensure that individualized supports were provided to L.P. to ensure that L.P. can remain at a

community school. (Compl. ¶¶ 229–231.) Neither L.P. nor A.S. has standing to represent the

alleged class. *See Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 101 (2d

Cir. 2007) ("To have standing to sue as a class representative it is essential that a plaintiff [must]

be a part of that class, that is, he must possess the same interest and suffer the same injury shared

by all members of the class he represents.") That said, even a consideration of those allegations

only related to E.F., does not save Plaintiffs from the IDEA's exhaustion requirement.

      Determining whether a claim triggers the IDEA's exhaustion requirement may be more

art than science. In ascertaining whether a suit in fact seeks relief available under the IDEA, the

Supreme Court has advised: "the examination should consider substance, not surface. The use

(or non-use) of particular labels and terms is not what matters. The inquiry, for example, does

not ride on whether a complaint includes (or, alternatively, omits) the precise words 'FAPE' or

'IEP.'" *Fry*, 580 U.S. at 755. And "still more critically, a 'magic words' approach would make [the IDEA's] exhaustion rule too easy to bypass." *Id.*

      With this in mind, the Supreme Court counseled District Courts to ask two questions to clue in on what the gravamen of a complaint really is. *First*, the court should ask whether the plaintiff could have brought a claim of essentially the same alleged conduct at another public facility like a library or theater. *Id.* at 756. *Second*, the court should ask whether an adult at the school could press the same grievance. *Id.* Thus, under *Fry*:

> When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

*Id.* at 756. As Defendants rightly argue, in this case the answer to both of those questions is a resounding "no".

      Here, Plaintiffs allege that E.F. was placed in a District 75 school after her mother was "led . . . to believe that the District 75 school was the only option for E.F. and had more support in place for students like E.F."[4] (Compl. ¶ 152.) Plaintiffs complain that E.F.'s mother has "repeatedly asked that E.F. be placed in a less restrictive classroom setting so that E.F. can have more appropriate role models." (*Id.* ¶ 157.) These requests have been denied. (*Id.*) Moreover, according to the Complaint, the focus of E.F.'s education has not been educational but rather has been vocational, including, mopping sweeping, picking up recycling, making office furniture and setting tables at a catering facility. (*Id.* ¶ 161.) Perhaps as a result, E.F. is not given report cards

---

[4] According to the Complaint, in E.F.'s second-grade year, she was transferred to a District 31 school. (Compl. ¶ 141.) While there, E.F. "struggled academically and socially" and had "small outbursts." (Compl. ¶¶ 142,146.) Moreover, the school contacted E.F.'s parent almost daily regarding E.F.'s behavior. (*Id.* ¶ 144.) As a result, the school ultimately recommended that E.F. be placed in a District 75 school. (*Id.* ¶ 152.)

but instead progress reports measuring her progress towards her IEP goals.  These goals, according to Plaintiffs are artificially "easy" to allow for E.F. to meet them, notwithstanding that E.F.'s mother has advocated more "ambitious goals."  (Compl. ¶ 164.)  Ultimately, Plaintiffs allege that "E.F. could be educated in a District 31 school."  (*Id*. ¶ 167.)

Against this factual backdrop, the Court is at a loss as to how these allegations would permit E.F. to pursue a claim under the ADA, the IDEA, or Section 504 if this conduct occurred in another public setting.  Indeed, the Court cannot see how that conduct could even occur elsewhere.  Likewise, there is no basis to conclude that any adult could advance the claims raised here on these facts.

Plaintiffs' generalized allegations concerning the structure and programming at District 75 schools fare no better.  In sum, Plaintiffs complain that Defendants deny District 75 students "the many positive benefits of being educated in classrooms with their peers without disabilities, including access to a curriculum that meets the requirements of a regular high school diploma, higher educational expectations set by both teachers and peers, and learning appropriate social skills and behaviors modeled by classmates without disabilities."  (Compl. ¶85.)  More specifically, Plaintiffs allege that: (1) the District 75 curriculum is substandard (2) the DOE does not provide District 75 students with the same educational tools and other means of engaging students in learning as students without disabilities; (3) District 75 students spend hours a day on busy work as opposed to academic work; (4) District 75 students have no or minimal access to after-school or extracurricular activities, such as clubs or sports teams; (5) District 75 students are often prevented from taking electives; and (6) District 75 students rarely have a chance to earn a standard diploma, like the diploma awarded to other students at other schools.  (*Id*. ¶¶ 84–100.)

12

The Court is reminded of another hypothetical posed by the Supreme Court in *Fry*:

> Suppose . . . that a student with a learning disability sues a school under Title II for failing to provide remedial tutoring in mathematics. That suit, too, might be cast as one for disability-based discrimination, grounded on the school's refusal to make a reasonable accommodation; the complaint might make no reference at all to a FAPE or an IEP. But can anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial? The difficulty of transplanting the complaint to those other contexts suggests that its essence – even though not its wording – is the provision of a FAPE, thus bringing Section 1415(1) into play.

*Fry*, 580 U.S. at 757. The Court sees no meaningful distinction between this hypothetical and Plaintiffs' complaints concerning District 75's curriculum, provision of educational tools, access to extracurricular activities, and the type of diploma awarded.

Plaintiffs' reliance on *Lawton v. Success Acad. Charter Sch., Inc.,* and *Joseph S. v. Hogan* to convince the Court otherwise is misplaced. (*See* Pls.' Opp'n at 11.) In *Lawton* five students with disabilities brought claims under the ADA and Section 504 alleging that a former school principal maintained a "Got to Go" list intended to remove disabled students from the school. 323 F. Supp. 3d 353, 361 (E.D.N.Y. 2018). The court held that "while plaintiffs' allegations occasionally touch on denial of a FAPE and failure to reasonably accommodate the students, the vast majority of the allegations . . . concern intentional discrimination and retaliation." *Id.* at 362. At first blush, the allegations in *Lawton* appear similar to those present here. However, in *Lawton*, the plaintiffs alleged facts detailing unjustified discrimination. Importantly, plaintiffs alleged that the principal (i) deliberately targeted disabled students for removal from the school because of their "actual or perceived disabilities", (ii) segregated plaintiffs from other students in their class, (iii) denied plaintiffs the right to participate in the same programs as their peers, (iv) barred students from the school entirely, (v) dismissed plaintiffs from school early, (vii) "suspend[ed] them repeatedly," and (vi) failed to provide the

13

students with academic instruction while they were removed from the classroom.  *Id*.  These sorts of allegations are not pleaded here.

Similarly, Plaintiffs' reliance on *Joseph S. v. Hogan* as a *Fry* hypothetical is misplaced because that case involved adult plaintiffs in a non-school setting.  In *Joseph S.*, plaintiffs challenged the treatment of adults with mental illness "who have been or will be unlawfully discharged from psychiatric hospitals and hospital psychiatric wards to nursing homes."  561 F. Supp. 2d 280, 286 (E.D.N.Y. 2008).  Specifically, plaintiffs alleged "that many of the individuals with mental illness who are residing in nursing homes do not require any nursing or medical care, and are eligible to receive treatment in more integrated community settings."  *Id*. at 291– 292.  Thus, the court concluded that these individuals were "unnecessarily segregated" because their needs could have been met in a more integrated setting.  *Id*. at 292.  Unlike the case here, the allegations of segregation in *Joseph S.* occurred outside of a school setting.

Unlike the cases relied upon by Plaintiffs, the Court finds persuasive cases cited by Defendants.  *Parent/Pro. Advoc. League v. City of Springfield, Massachusetts* is particularly instructive.  934 F.3d 13, 22 (1st Cir. 2019).  In *Parent/Pro*, a proposed class of plaintiffs alleged that defendants discriminated against disabled students by (i) segregating them in an "alternative [set of] schools . . . for students with social emotional behavioral disabilities"; (ii) providing them with "unequal educational services"; and (iii) "denying them the opportunity to receive educational services in the most integrated setting appropriate to their needs."  934 F.3d 13, 22 (1st Cir. 2019).  Applying *Fry*, the court found the gravamen of the complaint challenged defendant's provision of FAPE, and thus exhaustion was required.  *Id*. at 25–26.  Although the complaint pleaded disability-based discrimination by unnecessarily segregating students with disabilities in separate and unequal educational programs, the "crux of the complaint [was] that

14

the defendants failed to provide the educational instruction and related services that the class plaintiffs need to access an appropriate education in an appropriate environment." *Id.* at 25.

Ultimately, on the facts alleged in this case, the exhaustion requirement is similarly triggered. Certainly, as Plaintiffs note, the exhaustion requirement can be excused under certain circumstances, including where exhaustion would be futile. *See Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 249 (2d Cir. 2008) ("The exhaustion requirement is excused when exhaustion would be futile because the administrative procedures do not provide an adequate remedy.") Of particular relevance here, the IDEA's exhaustion requirement is excused "when exhaustion would be futile because the administrative procedures do not provide an adequate remedy." *J.S. ex rel. N.S. v. Attica Cent. Scho.*, 386 F.3d 107, 112 (2d Cir. 2004). This is so where a plaintiff alleges a systemic violation. *Id.* at 113; *see also Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 205 (2d Cir. 2007) (exhaustion futile in situations where "adequate remedies are not reasonably available" or where "the wrongs alleged could not or would not have been corrected by resort to the administrative hearing process"). As ably put by one court, where a complaint alleges a systemic violation rooted in DOE policies or practices, hearing officers "have no power to alter the City's policies or general practices and cannot issue prospective relief." *M.G. v. New York City Dep't of Educ.*, 15 F. Supp. 3d 296, 305 (S.D.N.Y. 2014). Hence, in such a case, exhaustion must be excused.

Here, Plaintiffs maintain, consistent with this principle, they can avoid the exhaustion requirement because they complain of a systemic unlawful practice: "namely, that 'by unnecessarily segregating students with disabilities from their peers without disabilities, Defendants violate the ADA, Section 504, the IDEA and the NYCHRL, which all require public school districts to provide programs, services, and activities to students with disabilities in the

most integrated setting appropriate." (Pls.' Opp'n at 6.)  The Court does not disagree that the law demands as much.[5]  However, absent from Plaintiffs' complaint are any allegations that support the existence of a policy or practice to the contrary.  Here, Plaintiffs urge the Court not to focus on E.F. alone, but rather the totality of their allegations.  It has.  Yet, the Court still cannot discern any alleged practice or policy to "unnecessarily segregate" students with disabilities.  None of the generalized allegations concerning District 75 suggest as much.  And the Individual Plaintiffs allegations do violence to any such claim.

Take A.S.  As the complaint alleges, in December of 2019, albeit at his mother's insistence, A.S. was observed in his classroom at his District 75 school.  (Compl. ¶ 195.)  As a result of that individualized observation, it was determined that A.S. did not require a segregated school.  Thus, in March 2020, A.S. was enrolled in a community school from his home.  (*Id.* ¶ 196.)  As for L.P., simply put, he has always attended a community school.  Certainly, the Court cannot infer a system to unnecessarily segregate disabled students from allegations concerning two students who are in an integrated school setting.

And then there is E.F.  According to the complaint, E.F. attended a private, segregated school for autistic children from kindergarten through second grade.  (Compl. ¶ 140.)  E.F., however, failed to make progress at the segregated school and was transferred to a community school in District 31.  (*Id.* ¶ 141)  There, E.F. "struggled academically and socially."  (*Id.* ¶ 142.)  Moreover, E.F. had regular outbursts.  (*Id.* ¶ 146.)  Indeed, the school contacted E.F.'s mother almost daily concerning E.F.'s behavior, often requiring E.F.'s mother to pick E.F. up from school.  (*Id.* ¶ 144.)  The complaint attributes these challenges, at least in part, to the community

---

[5] *See Olmstead v. L.C. ex rel. Zimring*, 119 S. Ct. 2176, 2185 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination based on disability.  But we recognize, as well, . . . the States' obligation to administer services with an even hand.")

school's failure to provide necessary behavioral and academic support.  (*Id*. ¶ 147.)  In any event, after the completion of a Functional Behavioral Assessment ("FBA"), the DOE recommended that E.F. be placed in a more restrictive setting.  (*Id*. ¶ 149.)  E.F.'s mother subsequently enrolled her in a District 75 school.  (*Id*. ¶ 152)

Absent from these allegations is any suggestion that E.F.'s ultimate placement was based on a system or practice employed by the DOE rather than an individualized assessment of E.F. Indeed, the Court cannot help but contrast the allegations between A.S. and E.F.  That is, in one case, an individualized classroom observation led to A.S.'s transfer from a District 75 school to a community school.  And in the other, the completion of an individualized FBA (even belatedly), led to the "recommend[ation]" that E.F. be placed in a more restrictive setting.  (Compl. ¶ 149.) Far from systemic, the allegations demonstrate that in each case an individualized determination was made.

Absent any identifiable system or practice to segregate students with disabilities, the Court is left with a challenge to an individualized placement.  Of course, such challenges can and must first be brought before a hearing officer.  *See Kalliope R. ex rel. Irene D. v. New York State Dep't of Educ.*, 827 F. Supp. 2d 130, 135 (E.D.N.Y. 2010) ("Parents are specifically entitled to request a due process hearing in order to present complaints as to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education.").  Contrary to Plaintiffs' assertion under these circumstances, a hearing officer has the power and authority to issue relief.  *See J.S. ex rel. N.S.*, 386 F.3d at 110 ("The hearing officer issues a written decision which can be appealed to a state review officer of the New York Education Department).

17

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint is GRANTED.

SO ORDERED.

Dated: Brooklyn, New York                          /s/ LDH
      September 30, 2022                          LaSHANN DeARCY HALL
                                      United States District Judge